**GRAND UNION COMPANY,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 81–7557.**

United States Court of Appeals,
Eleventh Circuit.

Jan. 24, 1983.

Myles E. Eastwood, Asst. U.S. Atty., Atlanta, Ga., for defendant-appellant.

Frank C. Jones, King & Spalding, Michael Eric Ross, Atlanta, Ga., for plaintiff-appellee.

---

Before TJOFLAT, CLARK and MILL-ER*, Circuit Judges.

TJOFLAT, Circuit Judge:

The sole question presented in this appeal is whether there exists a genuine issue of material fact that precludes the district court from entering summary judgment for Grand Union Co. on the government's claim against it under the False Claims Act, 31 U.S.C. § 231 (1976). We conclude that such an issue exists, and therefore vacate the judgment of the district court and remand the case for further proceedings.

I.

The Food and Nutrition Service (FNS) of the United States Department of Agriculture is the agency charged with the supervision of the federal food stamp program. On January 16, 1979, the FNS determined that one of Grand Union's "Big Star" supermarkets in Richmond, Virginia, had a much higher rate of food stamp redemptions than its competitors. The FNS then conducted a field investigation of the store's redemption practices.

An FNS agent made five visits to the Big Star store over a two-week period, April 10–24, 1979. On each visit, the agent purchased several items that were clearly ineligible for food stamp purchases, e.g., cigarettes, household cleaning products, and paper products. Nonetheless, the FNS agent paid for these items with food stamps. The check-out counter cashiers who accepted the agent's food stamps turned them over to the store's head cashier, Inez Slaughter, along with the day's receipts, which included other food stamps. Slaughter endorsed all of the stamps, signed a certificate stating that they had not been accepted for ineligible items, and deposited them with Grand Union's bank in Richmond. In due course, the Treasurer of the United States redeemed the stamps, and Grand Union received the proceeds.

On May 29, 1979, the FNS informed Grand Union of the results of its investigation and disqualified the store from participation in the food stamp program for a period of one year.[1] Grand Union obtained review[2] of this decision within the agency, and the decision was affirmed.

Grand Union then brought suit against the United States to obtain judicial review of this agency action.[3] The United States

---

* Honorable Jack R. Miller, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The FNS acted pursuant to 7 C.F.R. § 278.-6(e)(2) (1979), which provides:

   (e) *Penalties.* FNS shall take action as follows against any firm determined to have violated the Act or regulations. The FNS regional office shall:

   \* \* \* \* \* \*

   (2) Disqualify the firm for 1 year if:

   (i) The evidence shows that: (A) It is the firm's policy to sell expensive or conspicuous nonfood items, cartons of cigarettes, or alcoholic beverages, in exchange for food coupons, and the firm has engaged in such practices . . .

   and

   (ii) The firm was warned about the possibility that violations were occurring and of the possible consequences of violating the regulations. The regional office may disqualify a firm for 1 year, even though the firm was not warned about the possibility that violations were occurring, if the regional office finds that the firm has committed unusually serious violations of the kind described in [(e)(2)(i)(A)] of this subparagraph.

2. Grand Union obtained review pursuant to 7 C.F.R. § 278.8 (1979), which provides that a food retailer, such as Grand Union, "aggrieved by administrative action under . . . [section 278.6] may file a written request for review of the administrative action with the food stamp review officer."

3. Grand Union proceeded under 7 U.S.C. § 2023 (Supp. IV 1980), which provides in pertinent part:

   If the store . . . feels aggrieved by such final determination, it may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business, or, in the case of a retail food store or wholesale food concern, in any court of record of the State having competent jurisdiction, within thirty days after the date of delivery or service of the final notice of determination upon it, requesting the court to set aside such determination.

   Grand Union also proceeded under 28 U.S.C. § 1346 (1976 and Supp. IV 1980), which provides in pertinent part:

counterclaimed against Grand Union, alleging that Grand Union's redemption of food stamps that it had obtained in the sale of ineligible items constituted a false claim against the United States, in violation of the False Claims Act, 31 U.S.C. § 231 (1976), thereby subjecting Grand Union to a $2,000 fine plus double the amount of any damages the Government may have sustained.[4] In its answer to the Government's counterclaim, Grand Union admitted that the alleged sales had occurred, but denied that it had violated the False Claims Act.

Following discovery, both parties moved for summary judgment. Grand Union supported its motion with the depositions of two of the check-out cashiers who had handled the FNS agent's purchases. In these depositions the cashiers admitted that they knew certain non-food items, such as cigarettes and cleaning products, could not be bought with food stamps and stated that they would not have knowingly accepted food stamps for such items. They denied ever accepting any food stamps from an FNS agent. Grand Union also presented the affidavit of Inez Slaughter, the head cashier who redeemed the stamps in question. Slaughter stated that she endorsed the food stamp coupons received from the cashiers, and certified that they had not been received in payment of ineligible items, under the expectation that the cashiers had accepted the food stamp coupons only for eligible food items. She further stated that she had never endorsed and certified any food stamp coupons knowing, or having any reason to believe, that any cashier had accepted any of them as payment for ineligible items.

The government countered with the authenticated reports of the FNS agent who directed the field investigation of Grand Union's Richmond store. These reports detailed the five visits and sales we have recited.

Before the district court could rule on the parties' motions for summary judgment, Grand Union notified the court that it had closed the store involved in the dispute and moved that its complaint be dismissed. The court granted the motion. The court then granted Grand Union's motion for summary judgment on the government's counterclaim.

The court rejected the government's argument that Grand Union was responsible, under the doctrine of respondeat superior, for the acts of its check-out counter cashiers in knowingly accepting food stamps for ineligible goods. In the court's view, the conduct of these cashiers was irrelevant; the dispositive issue was the intent of the head cashier, Inez Slaughter, in certifying that the food stamps she presented to the government for redemption had not been received as payment for ineligible items. The court looked to Slaughter's deposition for the answer and found that it evinced no knowledge or intent to defraud on her part. See Record, vol. I, at 365–66.

## II.

The record before us plainly permits the inference that the check-out cashiers knowingly permitted the FNS agent to purchase ineligible non-food items with food stamps.

(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

\*   \*   \*   \*   \*   \*

(2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon ... any regulation of an executive department ....

4. The False Claims Act, 31 U.S.C. § 231 (1976), provides:

Any person ... who shall make or cause to be made, or present or cause to be presented, for payment ... any claim upon or against the Government of the United States, or any

department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false ... certificate ... knowing the same to contain any fraudulent or fictitious statement or entry ... shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of the suit ....

The sole question we must decide, then, is whether the knowledge of these cashiers can be imputed to Grand Union.

We have held in cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment.[5] *United States v. Hangar One, Inc.,* 563 F.2d 1155 (5th Cir.1977); *accord United States v. Ridglea State Bank,* 357 F.2d 495 (5th Cir.1966); *see United States v. Aerodex, Inc.,* 469 F.2d 1003 (5th Cir.1972); *cf. Henry v. United States,* 424 F.2d 677 (5th Cir.1970) (partner's scienter imputed to partnership where partner acted on behalf of partnership).

In *Hangar One,* for example, we held liable under the False Claims Act a defense contractor whose employees knowingly delivered defective materials to the government because the employees were acting for the benefit of the contractor and within the scope of their employment. We rejected the contractor's claim that a corporation may not be charged with the knowledge of an employee who was not responsible for the operations of the corporation. We observed that

> [i]n *United States v. Ridglea State Bank,* 357 F.2d 495 (5th Cir.1966), this court indicated that *a corporation will be liable for violations of the False Claims Act if its employees were acting within the scope of their authority and for the purpose of benefiting the corporation....* In short, liability of a corporation for a False Claims Act violation may arise from the conduct of employees other than those with "substantial authority and broad responsibility."

*Hangar One,* 563 F.2d at 1158 (emphasis added).

Thus, the district court erred when it focused solely on the head cashier's knowledge when deciding the summary judgment motion.[6]

The judgment of the district court is VACATED, and this case is REMANDED for further proceedings.

CLARK, Circuit Judge, dissenting:

I respectfully dissent from the majority opinion because I believe the cases cited and relied upon do not support the conclusion reached by the majority. I believe the majority has confused the type or nature of knowledge that must be proved by the government to sustain a claim under the False Claims Act. The majority invokes a standard applicable in an ordinary civil action in which an employee's knowledge is imputed to a defendant corporation. The liability of the corporation in such a case, arising from, for example, defalcation or carelessness of an employee, is limited to the actual loss of the injured party. In a False Claims Act case the government seeks what are in effect punitive damages. In the present case, the government alleged a loss of $78.00, but it sought damages in the amount of $34,156.00, of which $156.00 was double damages and $34,000.00 was the sum of the $2,000.00 penalties for each of the seventeen transactions. In another False Claims Act case, our court held that where knowledge of a false claim or intent to defraud is an essential requirement for recovery, knowledge of an agent was not imputable to the corporation. *United States v. Ridglea State Bank,* 357 F.2d 495 (5th Cir.1966). That case is indistinguishable from this one.

The rule in our Circuit, that such knowledge is an essential requirement, has been clearly stated:

> The law is settled in this Circuit that to show a violation of the False Claims Act the evidence must demonstrate "guilty knowledge of a purpose on the part of [the defendant] to cheat the Govern-

---

**5.** Cases that the Court of Appeals for the Fifth Circuit decided prior to October 1, 1981, are precedent in this circuit. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

**6.** Because of our disposition in this case, we need not reach appellant's claim that the decision granting summary judgment should be reversed because the affidavits filed by Grand Union contained inadmissible evidence.

ment," *United States v. Priola,* 272 F.2d 589, 594 (5th Cir.1959), or "knowledge or guilty intent," *United States v. Ridglea State Bank,* 357 F.2d 495, 498 (5th Cir. 1966).

*United States v. Aerodex, Inc.,* 469 F.2d 1003, 1007 (5th Cir.1972). I would respectfully submit that nowhere in this record has the government demonstrated an inference that any employee of Grand Union had knowledge of a purpose to cheat the government, or knowledge or guilty intent as required by *Aerodex.* To oppose Grand Union's motion for summary judgment, the government was required to present some showing that a Grand Union employee knew his or her actions would result in Grand Union filing a false claim against the government or otherwise result in the government being defrauded. This degree or type of *scienter* cannot be inferred from the facts here.

The majority cites *Aerodex* and *United States v. Hangar One, Inc.,* 563 F.2d 1155 (5th Cir.1977). In *Hangar One,* the government filed affidavits of employees of Hangar One, Inc., who stated that they had personally engaged in acts of fraud against the United States by providing the government defective shells for use in the Vietnam War. The affiants were company inspectors who substituted defective shells for good ones after government inspectors had left the plant. It is obvious that such fraudulent actions of agents of the corporation would subject the corporation to liability under the False Claims Act and reversal of the summary judgment in favor of the corporation was appropriate.

The government in its brief relies upon a criminal case, *United States v. Milton,* 602 F.2d 231 (9th Cir.1979), which held: "To prove *falsity,* the government only had to prove that the statement was known to be untrue at the time Milton made it." (*Id.* at 233) (emphasis in the original). This case cuts against the government.

The majority opinion states: "The record before us plainly permits the inference that the check-out cashiers knowingly permitted the FNS agent to purchase ineligible non-food items with food stamps." at 890. The opinion of the district court elucidates this statement contained in the majority opinion as follows:

Grand Union has admitted, as alleged by the government, that three of its employees accepted food stamp coupons in exchange for 32 ineligible non-food items. The coupons, having a combined value of $78.00, were accepted in five transactions on four different days. Grand Union deposited the coupons into local banking channels for ultimate payment from the Federal Treasury. Grand Union was also required by Food Stamp regulations to submit to the local bank a certification that the coupons accepted that business day were accepted in exchange for eligible food items. The certifications for the four business days involved in this lawsuit are not in evidence and apparently are not available. However, the evidence shows that Grand Union's head cashier generally signed such certifications on behalf of Grand Union's store manager or assistant store manager. The head cashier stated in her deposition that her certifications were based on her belief that the check-out clerks complied with store policy regarding the acceptance of food stamp coupons. She also testified that she never signed a food stamp certification with knowledge or reason to believe of the existence of any irregularities. Two of the check-out clerks involved in these transactions stated that their understanding of store policy was "what you don't eat, you don't sell [for food stamps], except for beer and wine."

The violating items accepted in the transactions complained of in this lawsuit were all clearly non-food items. They included, among others, cigarettes, deodorant, thread, dusting cloths, tampons, roach killer, and hand lotion. By their own testimony, the clerks knew that these items were ineligible for purchase under the Food Stamp Program and, indeed, expressed doubt in their depositions that they would have accepted such items. Thus, notwithstanding the weaknesses in Grand Union's training program

pointed out by the government, the evidence establishes that it was not store policy to contravene the provisions of the federal food stamp law and that the primary rule dividing eligible from non-eligible foods was known to Grand Union's employees.

Record at 364.

The best case that could be stated for the government under the facts in this record is either that the three cashiers were careless in selling the non-food items or that they knew that they were selling non-food items, although they deny the latter. Giving the government all benefits of inferences that may be drawn from this record, it cannot be said that any agent or employee of Grand Union made or approved such sales of non-food items that would demonstrate "guilty knowledge of a purpose on the part of [Grand Union] to cheat the Government." See *Aerodex, supra.* Consequently, I would affirm the district court's findings of fact, which are based upon the record, and the conclusions of law, which are based upon the law of this Circuit.